IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| **POLYWAD, INC.,** | |
| *Plaintiff,* | **CIVIL ACTION NO.** |
| **v.** | **5:23-cv-00512-TES** |
| **ABLE'S SPORTING, INC.,** *et al.,* | |
| *Defendants.* | |

**ORDER GRANTING IN PART AND DENYING IN PART
GROUP 2 DEFENDANTS' MOTION TO DISMISS**

Plaintiff Polywad, Inc. ("Polywad") filed suit, alleging trademark infringement, unfair competition, and false designation of origin against 20 Defendants.[1] Now, before the Court is a Motion to Dismiss [Doc. 86] pursuant to Federal Rule of Civil Procedure 12(b)(2) filed by Defendants Arnzen Arms LLC ("Arnzen"), Glen's Army Navy Store, Inc. ("GANS"), SKE, Inc. d/b/a Mel's Sport Shop ("MSS"), Munitions Express LLC ("Munitions Express"), American Hunting and Firearms Services LLC d/b/a Salida Gunshop ("Salida Gunshop"), and Smoky Mountain Guns and Ammo LLC ("SMGA") (collectively, "Group 2 Defendants").

The Court previously granted Defendant GameMasters's separate Rule

---

[1] Plaintiff filed its Original Complaint [Doc. 1] on December 22, 2023, but on April 5, 2024, Plaintiff filed an Amended Complaint [Doc. 78], the operative pleading for purposes of this Order. *See* [Doc. 81].

12(b)(2) Motion to Dismiss [Doc. 87] but chose to refrain ruling on Group 2's because (1) GameMasters chose to move separately and (2) the facts supporting jurisdiction over Group 2 Defendants differ slightly (but importantly) from the facts supporting jurisdiction over GameMasters. *See* [Doc. 107]. For the foregoing reasons, the Court **GRANTS in part** Group 2's Motion to Dismiss [Doc. 86], **DISMISSING without prejudice** the claims against Defendants GANS, MSS, Munitions Express, Salida Gunshop, and SMGA. The Court **DENIES in part** the Motion as to Defendant Arnzen.[2]

## BACKGROUND

Plaintiff Polywad is a Georgia corporation that designs ammunition and consults with ammunition manufacturing companies. [Doc. 1, ¶¶ 4, 52]. Run by its sole employee, Jay Menefee, Polywad has sold and marketed products bearing its federally registered trademark, "Quik-Shok," since 1997.[3] [*Id*. at ¶¶ 52–54]. Beginning in 2001, Plaintiff entered into an agreement ("CCI Agreement") with Cascade Cartridge, Inc. ("CCI"), allowing CCI to sell a product using Plaintiff's mark ("CCI

---

[2] Arnzen joins in another pending motion [Doc. 85], this time pursuant to Federal Rule of Civil Procedure 12(b)(6), filed by Defendants Florida Gun Exchange, Inc. d/b/a Gunbuyer ("Gunbuyer"), Midway Arms, Inc. ("Midway Arms"), Delmic Enterprise LLC d/b/a Target Sports USA ("Target Sports"), and Sportsman's Guide LLC ("Guide") (collectively, "Group 1 Defendants"). *See* [Doc. 86-1, p. 2]. The Court will soon issue a ruling on Group 1's 12(b)(6) motion to determine whether the claims against Arnzen, as well as the Group 1 Defendants, will proceed for further factual development.

[3] Polywad received its trademark registration in 1999. [Doc. 78, ¶ 54]. Since 1997, Polywad alleges that it has invested significant time and money into promoting its brand and building consumer goodwill. [*Id*. at ¶¶ 56–57].

2

Product" or the "Product"). [Doc. 78-2, p. 2]. Plaintiff and CCI, however, terminated

their agreement in 2007—thus leaving CCI with no contractual right to use the "Quik-

Shok" mark. [*Id*.].

Unbeknownst to Plaintiff, the Defendants—who were in the business of selling

hunting and/or shooting supplies—continued offering the CCI Product for sale on

their websites using a picture of the Product with the old packaging containing the

"Quik-Shok" mark.[4] *See* [Doc. 78, ¶¶ 60–81]. Polywad alleges that Menefee diligently

protected the mark and would, for example, "regularly check retail shops which sold

ammunition for any infringing products." [*Id*. at ¶ 82]. Yet, for 16 years, Plaintiff had

no idea about the Defendants' allegedly infringing use. *See* [*id*. at ¶¶ 82–83]. This is

because, Plaintiff alleges, its sole owner, Menefee, is in his seventies and "is not

particularly 'computer-savvy.'" [*Id*. at ¶ 83]. Not until early June 2023 did Plaintiff

search the internet for the "Quik-Shok" mark and discover Defendants' use. [*Id*.].

Shortly after the discovery, Plaintiff sent cease-and-desist letters to each Defendant.

[*Id*. at ¶ 84]; [Doc. 78-2].

Although *none* of the Defendants are residents of Georgia,[5] Plaintiff asserts that

---

[4] Plaintiff does not allege that any Defendant actually sold any physical CCI Product bearing the mark. Instead, Plaintiff alleges that they displayed the old packaging on their website where they offered the CCI Product for sale. *See* [*id*. at ¶¶ 62–81].

[5] As for the residences of the Group 2 Defendants, Arnzen, and GANS, and MSS are Minnesota companies. [*Id*. at ¶¶ 12, 18, 24]. Munitions Express is a Florida company. [*Id*. at ¶ 28]. Salida Gunshop is a Colorado company, and SMGA is a Tennessee company. [*Id*. at ¶¶ 38, 40].

this Court has personal jurisdiction over them because of their ties with Georgia.[6] *See* [*id*. at ¶¶ 6–45, 49]. For example, without specifying any particular product, Plaintiff alleges that "Defendants have and continue to supply their products and services to partners in Georgia." [*Id*. at ¶ 50]. Alongside their Motion to Dismiss, Group 2 Defendants submitted affidavits from each of the Defendant companies' representatives, attempting to disprove Plaintiff's claim and establish that their companies have only meager ties with Georgia, if any, and which are unrelated to Plaintiff's cause of action.

According to the affidavits, Group 2 Defendants have made sales to Georgia residents or businesses in the following amounts:

| Defendant | Statement from Affidavit |
| --- | --- |
| Munitions Express | "Approximately 3.4% of ME's total sales is attributable to sales of products to residents and/or businesses located in Georgia." [Doc. 86-5, ¶ 3]. |
| SMGA | "Approximately, 2.02% of SMGA's total revenue is attributable to sales of products to residents and/or businesses located in Georgia." [Doc. 86-7, ¶ 3]. |
| Arnzen Arms | "Approximately 0.755% of Arnzen's total revenue is attributable to sales of products to residents and/ or businesses located in Georgia." [Doc. 86-2, ¶ 3]. |
| GANS | "Approximately 0.64% of GANS's total revenue is attributable to sales of products to residents and/or businesses located in |

---

[6] Plaintiff alleges that Defendants "have minimum contacts" with Georgia, "have purposefully availed [themselves] of the privileges of conducting business" within Georgia, "have purposefully injected [their] infringing products . . . into the stream of commerce, knowing that the infringing products would be sold in Georgia," and "have committed torts in or directed at entities" in Georgia. [*Id*. at ¶¶ 6–45, 49]. Additionally, Plaintiff alleges that its "causes of action arise directly from Defendants' business contacts and other activities" in Georgia. [*Id*.].

| | Georgia." [Doc. 86-3, ¶ 3]. |
|---|---|
| Salida Gunshop | "Approximately 0.12% of Salida Gunshop's total revenue is attributable to sales of products to residents and/or businesses located in Georgia." [Doc. 86-6, ¶ 3]. |
| MSS | "Approximately 0.06% of MSS's total revenue is attributable to sales of products to residents and/or businesses located in Georgia." [Doc. 86-4, ¶ 3]. |

None of the Group 2 Defendants owns any property, operates any office, or has any employees in Georgia. [Doc. 86-2, ¶ 7]; [Doc. 86-3, ¶ 7]; [Doc. 86-4, ¶ 7]; [Doc. 86-5, ¶ 7]; [Doc. 86-6, ¶ 7]; [Doc. 86-7, ¶¶ 7–8]. None of them has ever sold any of the CCI Products to Georgia residents or businesses. [Doc. 86-2, ¶ 4]; [Doc. 86-3, ¶ 4]; [Doc. 86-4, ¶ 4]; [Doc. 86-5, ¶ 4]; [Doc. 86-6, ¶ 4]; [Doc. 86-7, ¶ 4]. Further, none of the Group 2 Defendants did any business or had any contact with Polywad prior to receiving the cease-and-desist letter in June 2023. [Doc. 86-2, ¶¶ 8–9]; [Doc. 86-3, ¶¶ 8–9]; [Doc. 86-4, ¶¶ 8–9]; [Doc. 86-5, ¶¶ 8–9]; [Doc. 86-5, ¶¶ 8–9]; [Doc. 86-6, ¶¶ 8–9]. Finally, all of the Group 2 Defendants removed the allegedly infringing advertisement from their websites upon receiving Plaintiff's June 2023 cease-and-desist letter. [Doc. 86-2, ¶ 6]; [Doc. 86-3, ¶ 6]; [Doc. 86-5, ¶ 6]; [Doc. 86-6, ¶ 6]. Moreover, MSS's CEO testified that MSS *never* had an active advertisement for the accused Product; it only had links to an old inventory item that it never had in stock and was carried over by the prior business owner's inventory system, which it also removed upon receiving the cease-and-desist letter. [Doc. 86-4, ¶ 6].

In Response to the Motion to Dismiss, Plaintiff attaches numerous exhibits (obtained as public information) attempting to show that the Group 2 Defendants buy and sell products for several firearm and ammunitions companies that are based in Georgia. *See* [Doc. 89, ¶ 6][7]; *see, e.g.,* [Doc. 89-2]; [Doc. 89-3]. For example, Arnzen describes itself on its website as a "direct dealer[]" for a Georgia-based company, Heckler and Koch. *See* [Doc. 89-3], *in connection with* [Doc. 89-2]. The attached screenshots as to the remainder of the Group 2 Defendants show that they sell products manufactured by various Georgia companies—although, unlike Arnzen, the screenshots do not show that they have direct-dealer relationships with those Georgia companies. *See* [Doc. 89-3]; [Doc. 89-4]; [Doc. 89-5]; [Doc. 89-6]; [Doc. 89-7]; [Doc. 89-11].

## **LEGAL STANDARD**

"A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009). To establish a prima facie case, the plaintiff must "plead sufficient material facts" supporting jurisdictions—not mere legal conclusions. *Prentice v. Prentice Colour, Inc.*, 779 F. Supp. 578, 583 (M.D. Fla. 1991); *see United Techs. Corp.*, 556

---

[7] In Table 2 in its Response, Plaintiff provides an overview of its exhibits, listing which Defendants contract with which Georgia-based companies.

F.3d at 1274.

If the plaintiff pleads sufficient material facts, the Court must, at first, accept those allegations as true. *See Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000). But if the defendant refutes personal jurisdiction by—as here—submitting affidavit evidence in support of its position, the burden shifts back to the plaintiff to substantiate its jurisdictional allegations through affidavits, testimony, or other evidence of its own. *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000). "Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff." *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002).

To determine whether personal jurisdiction exists over an out-of-state defendant, courts undertake a two-step analysis. *United Techs. Corp.*, 556 F.3d at 1274. First, a court must determine whether the exercise of jurisdiction is appropriate under the state long-arm statute. *Future Tech. Today*, 218 F.3d at 1249; *see also Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1361 (11th Cir. 2006). Georgia's long-arm statute, O.C.G.A. § 9-10-91, provides six avenues for courts to exercise jurisdiction over nonresidents, two of which are relevant for purposes of this Order.

"A court of this state may exercise personal jurisdiction over any nonresident .

. . as to a cause of action arising from any of the acts . . . enumerated in this Code section" if the defendant "[t]ransacts any business within this state." O.C.G.A. § 9-10-91(1). A court could also exercise jurisdiction if the defendant "[c]ommits a tortious injury in this state caused by an act or omission outside this state *if* the tort-feasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state." O.C.G.A. § 9-10-91(3).

But the story doesn't end there. Even if the state long-arm statute is satisfied, courts must then consider "whether the exercise of jurisdiction over the defendant would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Melgarejo v. Pycsa Panama, S.A.*, 537 F. App'x 852, 858–59 (11th Cir. 2013). Under the federal standard, "due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945) (internal quotations omitted). In other words, and for all intents and purposes here, (1) the plaintiff must do something to target the forum state or its residents, and (2) the exercise of jurisdiction must be fair. *Licciardello v. Lovelady*, 544 F.3d 1280 (11th Cir. 2008) (citing *Keeton v. Hustler Magazine, Inc.*, 465

8

U.S. 770, 774 (1983)).

"District courts in Georgia should take care not to conflate these two inquires because Georgia's long-arm statute does not provide jurisdiction that is coextensive with due process." *Empirical Regent, LLC v. Sunny Design & Bus. Consulting, LLC*, No. 1:19-CV-3253-MHC, 2020 WL 4557564, at *4 (N.D. Ga. Feb. 25, 2020) (citing *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1259 (11th Cir. 2010)). In other words, these are two separate inquiries—both of which must be met to establish personal jurisdiction. *Id*.

## DISCUSSION

A Rule 12(b)(2) motion to dismiss attacks the district court's ability to assert jurisdiction over the defendant's person. Fed. R. Civ. P. 12(b)(2). It is essential for the Court to make this determination before it can do anything in this case. *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1214 n. 6 (11th Cir.1999) ("A court without personal jurisdiction is powerless to take further action."). Therefore, although the Group 2 Defendants join in Group 1's Motion to Dismiss for failure to state a claim, the Court had to first assess whether it has the jurisdiction to adjudicate a claim against each Defendant before it has authority to make any decision on the merits of Plaintiff's claims. *See id*. After careful consideration, the Court holds that Plaintiff has failed to meet its burden in establishing jurisdiction under Georgia's long-arm statute as to all Group 2 Defendants except Arnzen.

1. **<u>Georgia's Long-Arm Statute</u>**

Again, Georgia's long-arm statute reaches only those nonresidents whose conduct brings them under at least one of the six prongs of O.C.G.A. § 9-10-91. *Diamond Crystal*, 593 F.3d at 1259. Plaintiff contends that jurisdiction is proper over the Group 2 Defendants because they (1) transacted business in Georgia and (2) committed a tortious injury in Georgia caused by an act outside Georgia, *and* they regularly do or solicit business in Georgia. [Doc. 89, pp. 9, 11]; *see* O.C.G.A. § 9-10-91(1) & (3).

**A. O.C.G.A. § 9-10-91(1)**

The first prong of the Georgia long-arm statute provides that a court in Georgia may exercise jurisdiction over a defendant if the defendant "transacts any business within this state." O.C.G.A. § 9-10-91(1). The Eleventh Circuit has instructed that courts ought to interpret this requirement "literally." *Diamond Crystal*, 593 F.3d at 1259. Accordingly, "subsection (1) long-arm jurisdiction in Georgia expressly depends on the actual transaction of business—the doing of some act or consummation of some transaction—by the defendant in the state." *Id*. Georgia courts apply a three-part test to determine if jurisdiction is proper over a nonresident based on the transaction of business:

> Jurisdiction exists on the basis of transacting business in this state if [1] the nonresident defendant has purposefully done some act or consummated some transaction in this state, [2] if the cause of action

arises from or is connected with such act or transaction, and [3] if the exercise of jurisdiction by the courts of this state does not offend traditional fairness and substantial justice.

*Robertson v. CRI, Inc.*, 601 S.E.2d 163, 166 (Ga. Ct. App. 2004).

First, Plaintiff fails to articulate this well-established three-part test in its single Response to the two 12(b)(2) motions to dismiss. *See* [Doc. 89, pp. 9–11]. Second, Plaintiff only vaguely pleads that its "causes of action arise directly from Defendants' business contacts and other activities in the State of Georgia." *See* [Doc. 78, ¶ 49]. Even assuming this is a sufficient factual allegation, Plaintiff fails to substantiate the allegation when challenged. *See Polski Linie Oceaniczne v. Seasafe Transp. A/S*, 795 F.2d 968, 972 (11th Cir. 1986) (holding that the plaintiff failed to satisfy the "connexity" requirement under Florida's long-arm statute). Although Plaintiff does submit screenshots of the Group 2 Defendants' websites attempting to show that the companies "buy[] products from and sell[] products for a host of Georgia-based firearm and ammunition companies," the screenshots do not help Plaintiff establish that any of these transactions are *related to the cause of action*. *See* [Doc. 89, ¶ 6]. Therefore, Plaintiff fails to establish jurisdiction under § 9-10-91(1) as to any of the Group 2 Defendants.

**B.  O.C.G.A. § 9-10-91(3)**

Georgia's long-arm statute also allows for a court to exercise personal jurisdiction over a nonresident defendant who "[c]ommits a tortious injury in this

11

state caused by an act or omission outside this state *if* the tort-feasor regularly does or

solicits business, or engages in any other persistent course of conduct, or derives

substantial revenue from goods used or consumed or services rendered in this state."

O.C.G.A. § 9-10-91(3) (emphasis added). Plaintiff asserts that the relevant act outside

of Georgia is the use of Plaintiff's Quik-Shok® trademark on the CCI Product that the

Defendants were selling on their websites. *See* [Doc. 89, pp. 11–12]. The harm,

according to Plaintiff, occurred in its home state of Georgia and thus, there is a

tortious injury caused by an act outside the state. *See* [*id*. at p. 12]; O.C.G.A. § 9-10-

91(3). However, even granting Plaintiff that first prong, Plaintiff only manages to

establish that Group 2 Defendant Arnzen conducts regular business in Georgia. *See*

[Doc. 89, p. 12.].

        *i.*     *Tortious Injury in the State*

      Citing to various tort cases (but no trademark cases) from the Georgia Court of

Appeals, the Northern District of Georgia determined that for purposes of the

Georgia long-arm statute, the relevant harm is the likelihood of confusion among

consumers—not the Plaintiff's economic loss in the forum.[8] *Empirical Regent*, 2020 WL

---

[8] This seems to differ from the Eleventh Circuit's interpretation of the federal standard, in which the harm in a trademark case (for purposes of the Due Process Clause) occurs to the trademark holder in the trademark holder's place of residence. *See Licciardello v. Lovelady*, 544 F.3d 1280, 1287 (11th Cir. 2008) (holding that a nonresident's intentional use of a resident's trademark was "expressly aimed at a specific individual in the forum whose effects were suffered in the forum," satisfying the minimum contacts prong of the federal standard).

4557564, at *8. In other words, according to the Northern District, Plaintiff's Amended Complaint would need to adequately plead that the Group 2 and 3 Defendants' use of Plaintiff's trademark was likely to confuse *Georgia* consumers. *See id.*

Although Plaintiff's Amended Complaint—in conclusive fashion—asserts that "Defendants have committed torts in or directed at entities within Georgia," it asserts no factual allegations about confusion among Georgia consumers in particular.[9] *See* [Doc. 78, ¶ 49]. And then, after Group 2 Defendants and GameMasters submitted their motions to dismiss, Plaintiff did not submit any evidence of consumer confusion in Georgia or any sales of the allegedly infringing Product to Georgia residents. *See generally* [Doc. 89]. Granted, Plaintiff did attach some exhibits showing Defendants' business ties with Georgia companies. *See, e.g.,* [Doc. 89-2]. However, none of the exhibits demonstrate anything related to the Product at issue or confusion among Georgia consumers. *See, e.g.,* [Doc. 89-2].

However, in all fairness to Plaintiff, and as the Court noted in its previous order granting Defendant SafeSide's Motion to Dismiss, the Court is not fully convinced that the Georgia Court of Appeals case that the Northern District relied upon—which involved a situation in which a plaintiff received a medical injury in another state but sought medical treatment (and therefore suffered economic loss) in

---

[9] Plaintiff does assert that the use of its trademark is "likely to cause confusion," but there is no allegation about confusion among Georgia consumers in particular. *See* [Doc. 1, ¶ 87].

Georgia—equally applies to trademark cases.[10] *See Gee v. Reingold*, 259 Ga. App. 894, 897 (2003)); [Doc. 88, p. 13]. Certainly, the Court agrees that "[a] tort occurs when and where the actual injury or accident takes place, and not at the place of the economic consequences of that injury." *Gee*, 259 Ga. App. at 897. But the harm in a trademark case is different: The harm a trademark holder suffers in his home state is not the same as a plaintiff suffering harm in one state but bringing the lingering consequences of the injury to the forum state, as in a medical injury case.

The Court thinks it plausible that a Georgia-resident plaintiff suffering harm to his brand in Georgia constitutes "a tortious injury in this state caused by an act or omission outside this state." *See* O.C.G.A. § 9-10-91(3). However, § 9-10-91(3) also contains a second requirement: The Group 2 Defendants must also regularly do business in, engage in a persistent course of conduct in, or derive substantial revenue from Georgia. *See id.*

  ii. *Regularly Conducts Business, Engages in Persistent Conduct, or Derives Substantial Revenue in Georgia*

Plaintiff's Amended Complaint contains very few factual allegations to support subsection (3)'s second prong—the only relevant allegations being that

---

[10] Although Group 2 Defendants acknowledged that the Court previously stated that Plaintiff had not adequately pled confusion among Georgia consumers in its order granting Defendant SafeSide's Motion to Dismiss, Defendants did not address the Court's other observation that the Northern District might have been mistaken in relying on non-trademark Georgia Court of Appeals cases. *See* [Doc. 94, p. 5]; [Doc. 88, p. 13].

"*Defendants* have and continue to supply their products and services to customers and partners in Georgia" and "regularly conduct business" in Georgia.[11] [Doc. 78, ¶¶ 49–50 (emphasis added)]. Plaintiff's Amended Complaint says nothing at all about revenue from Georgia residents, let alone "substantial revenue."[12] *See generally* [Doc. 78]. Therefore, Plaintiff fails to meet its burden of pleading a prima facie case of jurisdiction over any of the Group 2 Defendants under the "substantial revenue" prong.

On top of trying to proceed under the "substantial revenue" prong of § 9-10-

---

[11] Plaintiff could likewise be trying to assert jurisdiction on the basis that the websites displaying the Quik-Shok mark on the CCI Product were accessible to Georgia residents. [Doc. 78, ¶ 60]. However, even if Plaintiff had adequately pled this basis, operating a website that is merely accessible to residents of the forum state is not sufficient as a basis for jurisdiction under § 9-10-91(3). *Jordan Outdoor Enterprises, Ltd. v. That 70's Store, LLC*, 819 F. Supp. 2d 1338, 1343 (M.D. Ga. 2011).

[12] In rebuttal to the Plaintiff's assertion of jurisdiction, the Group 2 Defendants attached to their Motion to Dismiss affidavits containing the percent of their total sales and sales revenue derived from Georgia consumers. *See supra* "Background" Section. The affidavits show that they derive between 0.06 and 3.4% of their total revenue and/or sales from Georgia consumers (although none of them has ever sold any of the infringing Product to a Georgia consumer). [Doc. 86-1, p. 9].

Neither 0.06% on the low end nor 3.4% on the high end tells the Court exactly how much revenue (in numerical value) the Group 2 Defendants derive from Georgia consumers—so for all the Court knows, it could be the case that the Defendants mean 0.06% of $100,000,000—which could count as "substantial." *Compare Cont'l Rsch. Corp. v. Reeves*, 419 S.E.2d 48, 51 (Ga. Ct. App. 1992), *with Sol Melia, SA v. Brown*, 688 S.E.2d 675, 678, 681 (Ga. Ct. App. 2009); *see Candy Craft Creations, LLC v. Gartner*, No. CV 212-091, 2013 WL 12180699, at *5 (S.D. Ga. Feb. 4, 2013) ("Georgia courts have not identified with mathematical precision how to calculate whether a certain amount of revenue is substantial[,] . . . [but] they have indicated that, even a small proportion of a company's business can be substantial.").

However, Defendants' concession as to their Georgia-derived revenue does not relieve Plaintiff of its burden to plead facts supporting jurisdiction. And as explained in the main text, Plaintiff fails to plead facts supporting the "substantial revenue" prong of § 9-10-91(3). *See generally* [Doc. 78]. Moreover, in Response to the Defendants' affidavits, Plaintiff offered no evidence demonstrating that the Defendants receive high volumes of revenue from Georgia. *See generally* [Doc. 89].

91(3), however, Plaintiff also attempts to go the "regularly conducts business" route. [Doc. 89, p. 12]. Although Plaintiff's allegation that Defendants "regularly conduct business" in Georgia is conclusory, Plaintiff's allegation that "Defendants have and continue to supply their products and services to customers and partners in Georgia" is a factual allegation that could support jurisdiction under the "regularly conducts business" prong of § 9-10-91(3). *See* [Doc. 78, ¶¶ 49–50]. To be sure, the Court thinks it a flimsy factual allegation, as it lobs the same accusation at all 20 Defendants without distinguishing between any of their individual actions—something courts usually do not like when plaintiffs are alleging facts supporting their substantive claims. *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015) (warning against "asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions"). But despite its grouping of Defendants, the Court construes it as a factual allegation supporting jurisdiction and accepts it as true. *See Consol. Dev. Corp.*, 216 F.3d at 1291; *Meier*, 288 F.3d at 1269. So, once Defendants challenged the allegation, Plaintiff need only substantiate its allegation. *See Future Tech. Today, Inc.*, 218 F.3d at 1249.

In Response to the Group 2 Defendants' Motion and attached affidavits, Plaintiff attached numerous exhibits attempting to demonstrate the Group 2 Defendants' business ties to Georgia companies. *See* [Doc. 89, ¶ 6 ("As indicated on PJ Defendants' own websites, each of them also buys products from and sells products

for a host of Georgia-based firearm and ammunition companies, which are properly

characterized as business transactions . . . .")]; *see, e.g.*, [Doc. 89-2]. Specifically,

Plaintiff attaches screenshots of the Defendants' websites showing that they sell

products manufactured by Georgia companies. *Compare* [Doc. 89, ¶ 6], *and* [Doc. 89-

3], *with* [Doc. 89-2], *and* [Doc. 89-4], *and* [Doc. 89-4], *and* [Doc. 89-5], *and* [Doc. 89-6],

*and* [Doc. 89-7], *and* [Doc. 89-11], *and* [Doc. 89-12]. The problem for Plaintiff is that the

exhibits only succeed in showing a basis for jurisdiction under § 9-10-91(3) as to one

Defendant. We'll start there.

According to the exhibits, Arnzen describes itself on its website as a "direct

dealer[]" for a Georgia-based company, Heckler and Koch.[13] *See* [Doc. 89-3

(containing a screenshot of Arnzen's website listing the manufacturers whose

products it sells, including Heckler and Koch, for whom it is a "direct dealer")]; [Doc.

89-2 (listing Georgia-based manufacturing companies, including Heckler and Koch)].

Therefore, making all reasonable inferences in favor of Plaintiff, it would seem

Arnzen regularly transacts with a Georgia company. *See Meier*, 288 F.3d at 1269. Thus,

Plaintiff has met its burden in establishing that § 9-10-91(3) permits jurisdiction over

Arnzen.[14]

---

[13] It should be noted that Arnzen also lists on its websites manufacturers whose products it sells but that it is not a direct dealer for (and hence, companies that it does not directly transact with). *See* [Doc. 89-2, p. 2].

[14] Of course, as Georgia's long-arm statute is not co-extensive with the federal one, the Court still must assess whether the Due Process Clause permits jurisdiction, as it will do below.

Not so for the remainder of the Group 2 Defendants, however. As to Defendants SMGA and Salida Gunshop, Plaintiff attaches screenshots from the website of AmChar Wholesale, Inc. ("AmChar"), a non-party that Plaintiff paints as a "Georgia-based company." *See* [Doc. 89-8]; [Doc. 89, ¶ 6]. Although SMGA and Salida Gunshop do not describe themselves as direct dealers for AmChar as does Arnzen, AmChar's website lists SMGA and Salida Gunshop as dealers. [Doc. 89-8, p. 2]. However, although AmChar is registered as a "foreign profit corporation" in Georgia and describes itself as having a "secondary warehouse and distribution center in McDonough, Georgia," it would be a stretch to say that SMGA and Salida Gunshop "regularly conduct[] business" in Georgia because they contract with a company that has a registered agent and a warehouse site in Georgia. *See* [Doc. 89-9]; [Doc. 89-10]. Moreover, there is no evidence that the products SMGA or Salida Gunshop sell come from AmChar's Georgia warehouse.

Plaintiff's exhibits regarding Defendant GANS only show that GANS sells products whose manufacturers are located in Georgia, not that GANS buys the product directly from the Georgia companies or has any kind of direct-dealer or other business relationship with them. *See* [Doc. 89-4, pp. 8, 13, 38]. The same goes for Salida Gunshop, MSS, and Munitions Express. *See* [Doc. 89-7]; [Doc. 89-5, p. 2]; [Doc. 89-6, pp. 2–4, 8]. Aside from AmChar, Plaintiff also lists several companies SMGA and Salida Gunshop allegedly buy and sell products from. [Doc. 89, ¶ 6]. However,

like with Defendants GANS, MSS, and Munitions Express, these attachments do not

establish that SMGA or Salida Gunshop directly transact with these Georgia

manufacturers. *See* [Doc. 89-7]; [Doc. 89-10].

    **2.  <u>Federal Due Process</u>**

      As stated above, Georgia's long-arm statute is not coextensive with the federal

standard. *Empirical Regent*, 2020 WL 4557564, at *4. In other words, Georgia does not

permit the exercise of personal jurisdiction over non-Georgia residents to the full

extent permitted by the United States Constitution. *See id*. Thus, although the Due

Process Clause may not prohibit jurisdiction over Defendants GANS, MSS, Munitions

Express, Salida Gunshop, and SMGA, Georgia law does. The Court will, therefore,

only engage on the federal standard as to Defendant Arnzen, over whom jurisdiction

is proper under § 9-10-91(3).

      The Eleventh Circuit has held that for purposes of the Due Process Clause, a

nonresident defendant's *intentional* use of the plaintiff's trademark constituted

targeting of an individual in the forum state—thus satisfying the "minimum

contacts" prong of the federal standard, as well as the fairness factors. *Lovelady*, 544

F.3d at 1284; *see Calder v. Jones*, 465 U.S. 783, 784 (1984) (affirming California's exercise

of jurisdiction over nonresident defendants who published a libelous article about a

California resident on the basis that she experienced the "brunt of the harm" in

California); *see also Keeton*, 465 U.S. at 776–77 (affirming the exercise of jurisdiction

over a nonresident defendant magazine who published a libelous magazine in the forum). In other words, Eleventh Circuit precedent seems to indicate that jurisdiction is proper under the federal standard if a defendant's use of a trademark was intentional. *See Lovelady*, 544 F.3d at 1284. Plaintiff's Amended Complaint alleges intentional use, and Arnzen's affidavit attached to Group 2's Motion to Dismiss does not refute Plaintiff's contention. *See* [Doc. 78, ¶¶ 91, 104, 113]; *see generally* [Doc. 86-2]. Therefore, under Eleventh Circuit precedent, the Due Process Clause permits jurisdiction over Arnzen. *See id*.

3. **Jurisdictional Discovery**

In the alternative to asking the Court to deny Group 2's Motion to Dismiss, Plaintiff asks the Court to order jurisdictional discovery. [Doc. 89, p. 17]. First things first: "The purpose of jurisdictional discovery is to ascertain the truth of the allegations or facts underlying the assertion of personal jurisdiction. It is not a vehicle for a fishing expedition in hopes that discovery will sustain the exercise of personal jurisdiction." *Atlantis Hydroponics, Inc. v. Int'l Growers Supply, Inc.*, 915 F. Supp. 2d 1365, 1380 (N.D. Ga. 2013) (cleaned up); *Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1216 (11th Cir. 2007) (denying a defendant's request for jurisdictional discovery as to the court's subject-matter jurisdiction as a "fishing expedition[]" where the defendant failed to carry its burden in establishing jurisdiction and where the defendant was the one who chose to remove the action to federal court in the first place).

20

Plaintiff barely manages to plead facts supporting jurisdiction, and once challenged, failed to carry its burden in showing that the remaining Group 2 Defendants have a regular business relationship with any Georgia manufacturers or wholesalers. *See* [Doc. 87-2, ¶ 3]. Additionally, Plaintiff's request for jurisdictional discovery is extremely broad, failing to specify what information it seeks and simply requesting that it be able to "explore these facts, including the nature, duration and frequency of the PJ Defendants' contacts with Georgia." [Doc. 89, p. 18]. Moreover, Plaintiff could have formally moved for jurisdictional discovery. Instead, it chose to embed its request in a response to a motion to dismiss. *See Wolf v. Celebrity Cruises, Inc.*, 683 F. App'x 786, 792 (11th Cir. 2017) (affirming a district court's denial of the plaintiff's motion for jurisdictional discovery where the request was "buried within his response" to the defendant's motion to dismiss and "did not specify what information he sought or how that information would bolster his allegations"). As permitting jurisdictional discovery would amount to a "fishing expedition," the Court thinks it unwarranted. *See Atlantis Hydroponics, Inc.*, 915 F. Supp. 2d at 1380; *Lowery*, 483 F.3d at 1216.

<u>**CONCLUSION**</u>

Accordingly, because Plaintiff has failed to meet its burden in establishing a basis for exercising personal jurisdiction over Defendants GANS, MSS, Munitions Express, Salida Gunshop, and SMGA, the Court **GRANTS in part** Group 2's Motion

[Doc. 86] as to those Defendants and **DISMISSES** Plaintiff's claims against them **without prejudice** pursuant to Rule 12(b)(2). Consequently, the Court **DIRECTS** the Clerk of Court to **TERMINATE** those Defendants as parties to this action. The Court **DENIES in part** the Motion [Doc. 86], finding that the remaining Group 2 Defendant, Arnzen, is subject to personal jurisdiction in Georgia. Plaintiff's request for jurisdictional discovery is **DENIED** as to all Group 2 Defendants. [Doc. 89, p. 17].

**SO ORDERED**, this 21st day of June, 2024.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**

22